159 F.3d 151
 130 Ed. Law Rep. 391
 COLUMBIA UNION COLLEGE, Plaintiff-Appellant,
v.
Edward O. CLARKE, Jr., in his official capacity as member of
the Maryland Higher Education Commission; J. Glenn Beall,
Jr., Honorable, in his official capacity as a member of the
Maryland Higher Education Commission; Dorothy Dixon Chaney,
in her official capacity as a member of the Maryland Higher
Education Commission; Donna H. Cunninghame, in her official
capacity as a member of the Maryland Higher Education
Commission; John J. Green, in his official capacity and as
a member of the Maryland Higher Education Commission; Jamie
Kendrick, in his official capacity and as a member of the
Maryland Higher Education Commission; Terry L. Lierman, in
his official capacity and as a member of the Maryland Higher
Education Commission; Osborne A. Payne, in his official
capacity and as a member of the Maryland Higher Education
Commission; R. Kathleen Perini; Charles B. Saunders, Jr.,
in his official capacity and as a member of the Maryland
Higher Education Commission; Richard P. Street, Jr., in his
official capacity and as a member of the Maryland Higher
Education Commission; Albert Nathaniel Whiting, in his
official capacity and as a member of the Maryland Higher
Education Commission, Defendants-Appellees.
Christian Legal Society; The Coalition for Christian
Colleges & Universities; Union of Orthodox Jewish
Congregation of America; The American Jewish Congress;
American Civil Liberties Union Foundation of Maryland;
Americans United for Separation of Church and State; The
Ant-Defamation League, Amici Curiae.
 No. 97-2656.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 3, 1998.
Decided Oct. 26, 1998.
 
 ARGUED: R. Hewitt Pate, Hunton & Williams, Richmond, Virginia, for Appellant. Mark Jason Davis, Assistant Attorney General, Baltimore, Maryland, for Appellees. ON BRIEF: Sarah C. Johnson, Hunton & Williams, Richmond, Virginia; Mark B. Bierbower, Hunton & Williams, Washington, D.C.; Michael P. McDonald, Michael E. Rosman, Michael J. Troy, Center for Individual Rights, Washington, D.C.; Professor Michael W. McConnell, Salt Lake City, Utah, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellees. Steven T. McFarland, Kimberlee W. Colby, Center for Law and Religious Freedom, Christian Legal Society, Annandale, Virginia; Nathan J. Diament, Institute for Public Affairs, The Union of Orthodox Jewish Congregations of America, New York, New York; Carl H. Esbeck, Columbia, Missouri, for Amici Curiae Christian Legal Society, et al. Mark D. Stern, American Jewish Congress, New York, New York, for Amicus Curiae Congress. Stuart H. Newberger, Jeffrey E. Greene, Crowell & Moring, L.L.P., Washington, D.C.; Dwight Sullivan, American Civil Liberties Union Foundation of Maryland, Baltimore, Maryland, for Amicus Curiae Foundation. Steven K. Green, Americans United for Separation of Church and State, Washington, D.C.; Steven Arent, Steven M. Freeman, David Rosenberg, Anti-defamation League, New York, New York, for Amici Curiae Americans United, et al.
 Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 Vacated and remanded by published opinion. Judge DIANA GRIBBON MOTZ wrote the majority opinion, in which Senior Judge BUTZNER joined. Chief Judge WILKINSON wrote a dissenting opinion.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 Columbia Union College, a four-year private liberal arts college affiliated with the Seventh Day Adventist Church, brought this action against the Maryland Higher Education Commission. Columbia Union alleged that the Commission's decision to deny it state funds under Maryland's Sellinger grant program violated the college's free speech, free exercise, and equal protection rights. Assuming that the Commission's action infringed one or more of these rights, the district court nonetheless granted summary judgment to the Commission. The court concluded that the Commission's action was justified by a compelling state interest. Specifically, the district court held that the undisputed facts demonstrated that Columbia Union is a "pervasively sectarian" institution, and so, under Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality opinion), the Commission could not provide public funds to the college without violating the Establishment Clause. Because the district court erred in holding that, as a matter of law, Columbia Union is "pervasively sectarian," we vacate and remand for further proceedings consistent with this opinion.
 
 I.
 
 2
 In 1971, the Maryland General Assembly statutorily created the Sellinger program to provide annual state-funded grants to qualifying private colleges, with the amount of funding determined by the number of full-time students attending the qualifying college. See Md.Code Ann., Educ. § 17-101 et seq. (1997).
 
 
 3
 To qualify for aid under the Sellinger program, an institution must: (1) be a nonprofit private college or university established in Maryland before July 1, 1970; (2) be approved by the Commission; (3) be accredited; (4) have awarded associate of arts or baccalaureate degrees to at least one graduating class; (5) maintain one or more degreed programs in subjects other than the seminarian or theological programs; and (6) demonstrate that no Sellinger funds will be used for "sectarian purposes" including "religious instruction, religious worship, or other activities of a religious nature." Id. §§ 17-103, 107; Md. Regs.Code tit. 13 B, § .01.02.06(A) (Supp.1996). So that the State can ensure institutions receiving aid under the Sellinger program continue to abide by the last requirement, those institutions must provide the Commission with annual pre- and post-expenditure affidavits detailing their intended and actual use of the funds. See Md. Regs.Code tit. 13 B, § .01.02.05 (Supp.1996). The Commission also reserves the right to audit an institution's books and records to ensure its compliance. Id.
 
 
 4
 Columbia Union initially applied for Sellinger funds in 1990. Two years later, acknowledging that the college met the first five statutory eligibility requirements, the Commission denied Columbia Union the Sellinger funds on the ground, inter alia, that the college was "pervasively sectarian" because it lacked institutional autonomy from the Seventh Day Adventist Church, it required religious worship by its students, its religion department sought to "set the tone" for college life, religion influenced non-theology courses, and a large percentage of students and faculty were church members. The Commission concluded that to provide a state grant to Columbia Union to fund ostensibly secular educational courses would impermissibly advance religion in violation of the Establishment Clause because the college's religious mission permeated even its assertedly secular educational functions. In reaching this conclusion, the Commission heavily relied on the Supreme Court's decision in Roemer. There, in an earlier Establishment Clause challenge to the Sellinger program, the Court categorically announced that "no state aid at all[can] go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones." Roemer, 426 U.S. at 755, 96 S.Ct. 2337. The college did not appeal the Commission's 1992 decision.
 
 
 5
 This is where matters stood until 1995. Then, in reliance on Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), Columbia Union requested that the Commission reconsider its application for a Sellinger grant. The college requested $806,079 in public monies to fund the total budget of its mathematics, computer science, clinical laboratory science, and respiratory care departments and forty percent of its nursing department. Once again, the Commission rejected Columbia Union's request, stating that unless the nature and practices of the college had materially changed since 1992, it would be rejected on the same ground.
 
 
 6
 Columbia Union thereafter filed suit in federal court seeking declaratory and injunctive relief based on alleged statutory and constitutional violations. The district court dismissed the action without prejudice on the ground that it was not ripe because the college had not formally reapplied for Sellinger funds. Columbia Union agreed to reapply and the Commission agreed to review the application on an expedited basis. The parties further agreed that the Commission's review would be conducted without an administrative hearing.
 
 
 7
 On October 24, 1996, the Commission again denied Sellinger funds to Columbia Union, again citing the Establishment Clause. The Commission based its decision largely on information included in Columbia Union's publications and course descriptions, specifically noting that it did not review any "statistics" regarding how Columbia Union's policy actually affected student admissions and faculty hiring.
 
 
 8
 Two months later, Columbia Union filed an amended complaint alleging statutory and constitutional claims. The statutory claim was based on the Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb et seq. (West 1994) (RFRA), and the district court dismissed it in light of City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 2160, 138 L.Ed.2d 624 (1997) (invalidating RFRA). See Columbia Union College v. Clarke, 988 F.Supp. 897, 900 (D.Md.1997). On the college's constitutional claims--asserted denial of free speech, free exercise, and equal protection rights--the district court granted summary judgment to the State. Id. at 904-06. The court assumed for purposes of summary judgment that the Commission's denial of funding violated one or more of Columbia Union's constitutional rights, but held any violation justified by a compelling state interest--compliance with the Establishment Clause. Id. The court held, as a matter of law, that (1) the Establishment Clause prohibited any state from directly funding a "pervasively sectarian" institution and (2) Columbia Union is a "pervasively sectarian" institution. Id. at 900-01. Columbia Union noted a timely appeal.
 
 II.
 
 9
 We first address Columbia Union's contention that the Commission's decision to deny the college Sellinger funds infringed its First Amendment right to free speech.[1] Only if the denial, absent any Establishment Clause concerns, encroached upon the college's free speech right need we reach the Establishment Clause question.
 
 
 10
 The college maintains that Rosenberger "governs" and requires a holding in its favor. The State's sole response is that any curtailment of Columbia Union's speech is justified by a compelling state interest--avoiding a violation of the Establishment Clause. Although the need to comply with Establishment Clause requirements certainly justifies a free speech infringement, see infra § III, it does not eliminate the infringement. Accordingly, Maryland's response does not answer the question of whether denial of Sellinger funding in the first instance curtails Columbia Union's free speech right.
 
 
 11
 Rosenberger, however, provides a good deal of guidance on this question. Consistent with prior Supreme court precedent, it teaches that generally the First Amendment forbids the government from discriminating for or against private speech because of the content or viewpoint of the speech. See Rosenberger, 515 U.S. at 828, 115 S.Ct. 2510. Even where the government subsidizes, rather than penalizes, private speech it usually cannot "favor some viewpoints or ideas at the expense of others." Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).
 
 
 12
 However, the government, provided it does not violate the Establishment Clause, may selectively aid certain kinds of private speech and thereby "regulate the content of what is or is not expressed" in two clearly defined instances. Rosenberger, 515 U.S. at 833, 115 S.Ct. 2510. First, the government may provide assistance to certain viewpoints when "it enlists private entities to convey its [the government's] own message." Id.; see also Rust v. Sullivan, 500 U.S. 173, 198-99, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Second, the government may appropriate public funds "to promote a particular policy of its own." Rosenberger, 515 U.S. at 833, 115 S.Ct. 2510. This case presents neither of those two circumstances. Maryland does not seek, through the Sellinger program, to enlist private colleges either to convey some message for the state or to promote a particular state policy.
 
 
 13
 Rather, Maryland provides Sellinger grants to "support[ ] private higher education generally, as an economic alternative to a wholly public system." Roemer, 426 U.S. at 754, 96 S.Ct. 2337 (emphasis added). Thus, the State funds a broad array of qualifying private colleges to encourage alternative sources of higher education. Rosenberger teaches that "viewpoint-based restrictions are [not] proper" when the government "expends funds to encourage a diversity of views." 515 U.S. at 834, 115 S.Ct. 2510; see also Lamb's Chapel, 508 U.S. at 394, 113 S.Ct. 2141 (public school facilities made widely available after hours cannot be denied to a group merely because of its religious views); Widmar v. Vincent, 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (public university may not deny religious student group access to facilities made available to all other non-religious student groups); cf. National Endowment for the Arts v. Finley, --- U.S. ----, ----, 118 S.Ct. 2168, 2178, 141 L.Ed.2d 500 (1998) (government permitted to selectively subsidize artists because "competitive" funding process means "[g]overnment does not indiscriminately 'encourage a diversity of views from private speakers' " (quoting and distinguishing Rosenberger, 515 U.S. at 834, 115 S.Ct. 2510)).
 
 
 14
 For these reasons, we agree with Columbia Union that Rosenberger controls the resolution of its free speech claim. In Rosenberger a public university encroached upon the free speech rights of a student magazine, Wide Awake, when it paid an outside contractor to service the printing needs of student publications but refused to provide this benefit to Wide Awake "solely on the basis of its religious viewpoint." Rosenberger, 515 U.S. at 837, 115 S.Ct. 2510. The Sellinger program similarly infringed on Columbia Union's free speech rights by establishing a broad grant program to provide financial support for private colleges that meet basic eligibility criteria but denying funding to Columbia Union solely because of its alleged pervasively partisan religious viewpoint.
 
 
 15
 As in Rosenberger, "[i]t remains to be considered whether the [free speech] violation following from the [government's] action is excused by the necessity of complying with the Constitution's prohibition against state establishment of religion." Id. Accordingly, as the Rosenberger Court did, we now "turn to that question." Id.
 
 III.
 
 16
 To justify an infringement on Columbia Union's free speech rights, Maryland must demonstrate that its decision to deny funding to Columbia Union "serve[s] a compelling state interest and that it is narrowly drawn to achieve that end." Widmar, 454 U.S. at 270, 102 S.Ct. 269. Undoubtedly, as Columbia Union properly conceded at oral argument, the need to comply with the Establishment Clause constitutes such an interest. Id.; Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761-62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); Lamb's Chapel, 508 U.S. at 394, 113 S.Ct. 2141; see also Rosenberger, 515 U.S. at 838-39, 115 S.Ct. 2510.[2]
 
 
 17
 In Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court enunciated a three-part test to determine whether government action violates the Establishment Clause. To satisfy the prohibition against conduct that establishes religion, government action must (1) have a secular purpose; (2) have as its "primary effect ... one that neither advances nor inhibits religion"; and (3) "not foster an excessive government entanglement with religion." Id. at 612-13, 91 S.Ct. 2105 (internal quotation marks and citations omitted). Recently, the Court reaffirmed the importance of the "purpose" prong and concluded that the "effect" and "entanglement" prongs rightly comprise a single "effect" inquiry. Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 2010, 2015, 138 L.Ed.2d 391 (1997). The State does not suggest that the Sellinger program fails to serve a secular propose--i.e., supporting higher education generally--and so satisfies the first prong of the Lemon test. Thus, the only Establishment Clause issue presented in this case is whether directly granting state funds to Columbia Union would have the impermissible effect of advancing religion.
 
 A.
 
 18
 We begin our inquiry by recognizing the direct applicability of Roemer, 426 U.S. at 736, 96 S.Ct. 2337. In that case, four Maryland taxpayers challenged the constitutionality of the very grant program at issue here, id. at 744, 96 S.Ct. 2337, and, as here, the purpose prong of the Lemon test was "not in issue," id. at 754, 96 S.Ct. 2337. The taxpayers alleged that the State's provision of state funds--Sellinger grants--to private colleges affiliated with the Roman Catholic Church had the primary effect of advancing religion in violation of the Establishment Clause. Id. In a plurality opinion, the Supreme Court held that the state could provide direct government funds to support the general secular educational activities of the church-affiliated colleges because religion did not so permeate those colleges that their religious and sectarian roles were indivisible. Id. at 755-59, 96 S.Ct. 2337. Although the colleges unquestionably were affiliated with a church, they were not, the Court held, "pervasively sectarian," so the direct grant of government funds to them did not violate the Establishment Clause. Id. at 758-59, 96 S.Ct. 2337.
 
 
 19
 The Roemer Court carefully distinguished a "pervasively sectarian" institution from a "religiously affiliated" one. A "pervasively sectarian" college is unable to separate its secular, educational mission from sectarian indoctrination. Id. Because "religious and secular functions [are] inseparable" at a pervasively sectarian college, id. at 750, 96 S.Ct. 2337, no safeguard can ensure that direct monetary aid, even if designated to fund the school's secular functions, will not aid its religious mission. See id. at 758 n. 21, 96 S.Ct. 2337 (In a "pervasively sectarian" college, "because of the institution's general character ... courses could not be funded without fear of religious indoctrination."). By contrast, an institution not pervasively sectarian but simply "affiliated" with a religious organization could pursue purely secular purposes. Government assistance to such a religious institution--directed only to those purely secular purposes--would not impermissibly advance religion. Thus, the church-affiliated, but not pervasively sectarian, colleges in Roemer could receive money grants for secular instruction because they could separate secular from religious activities and demonstrate that government funds would flow only to secular educational activities. Roemer, 426 U.S. at 762, 96 S.Ct. 2337.
 
 
 20
 The Roemer Court explained that when providing funds to private institutions "[n]eutrality is what is required" from the states, meaning "[t]he state must confine itself to secular objectives, and neither advance nor impede religious activity." Id. at 747, 96 S.Ct. 2337. The Court cautioned, however, that "a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity." Id. For example, "[t]he State may not ... pay for what is actually a religious education" by providing money grants to a pervasively sectarian college, even though the state "purports to be paying for a secular [education], and even though it makes its aid available to secular and religious institutions alike." Id. Although Roemer solely involved direct money grants, the Court declared, in dicta, that "no state aid at all [may] go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones." Id. at 755, 96 S.Ct. 2337 (emphasis added) (citing Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973)).
 
 
 21
 The Supreme Court has never expressly overruled Roemer. Columbia Union does not and cannot claim to the contrary. What Columbia Union does contend is that recent Supreme Court cases have effectively overruled Roemer. The college asserts that these cases "establish" that it "may properly participate in the Sellinger program even if [it] were found to be pervasively sectarian." Reply Brief at 9 (emphasis in original). Before addressing these cases, we note the limits of our role as an intermediate appellate court in determining the continued viability of Supreme Court precedent. The Supreme Court has recently and unequivocally "reaffirmed" that lower courts are not to "conclude" that the Court's "more recent cases have, by implication, overruled [its] earlier precedent." Agostini, 117 S.Ct. at 2017 (emphasis added). Rather,
 
 
 22
 if a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the line of cases which directly controls, leaving to [the Supreme] Court the prerogative of overturning its own decisions.
 
 
 23
 Id. (emphasis added) (quoting Rodriquez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Thus, in Agostini, the Supreme Court, even though it overruled its prior precedents, commended the district court and court of appeals for following those very precedents "unless and until" the Supreme Court itself "reinterpreted the binding precedent." Id.
 
 
 24
 We have consistently adhered to the Agostini directive, see, e.g., West v. Anne Arundel County, 137 F.3d 752, 760 (1998), and will not do otherwise here. Agostini particularly resonates here because, as in Agostini, this case involves an Establishment Clause challenge to a specific grant program previously addressed by the Court. Indeed, Columbia Union itself recognizes that "[t]he fact that Roemer was decided in relation to the very program at issue here necessarily calls upon this [c]ourt to be careful in evaluating the effect of later cases." Reply Brief at 20. Thus, "unless and until" the Supreme Court has clearly overruled Roemer, we must apply its holding, which "directly controls" this case. Agostini, 117 S.Ct. at 2017.
 
 B.
 
 25
 In arguing that the Court has overruled Roemer, Columbia Union principally relies on Witters v. Washington Department of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), Agostini, and Rosenberger. The college claims that these cases have nullified Roemer 's holding that the Establishment Clause permits direct state money grants to the general secular educational programs of religious colleges only if those colleges are not pervasively sectarian. Although these cases unquestionably undermine the Roemer dicta that "no state aid at all" is permissible to a pervasively sectarian institution, we can find nothing in them or any other Supreme Court precedent that eviscerates Roemer 's holding regarding direct money grants.
 
 
 26
 In Witters, the Supreme Court held that the Establishment Clause did not prohibit a blind student from using funds that would be awarded to him, pursuant to a state vocational assistance grant, to finance pastoral studies at a Christian college. Witters, 474 U.S. at 488-89, 106 S.Ct. 748. The Court refused to find the grant was an "impermissible 'direct subsidy' " to a religious school because although state aid "ultimately flow[ed] to religious institutions" this was "only as a result of the genuinely independent and private choices of aid recipients." Id. at 488, 106 S.Ct. 748. Prospective individual students--not institutions--were the only parties eligible to receive the state grants and so "the decision to support religious education [wa]s made by the individual not by the State." Id. (emphasis added); see also Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 10, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) ("By according parents freedom to select a school of their choice," providing sign language interpreter to deaf student attending Catholic school was "only as a result of the private decision of individual parents ... [and] cannot be attributed to state decisionmaking.").
 
 
 27
 Columbia Union contends that, because the amount of Sellinger funds awarded to a given college depends on the number of students enrolled, Sellinger grants are based on the same student "private choices" that rendered the Witters grant constitutional. We are not persuaded. The state aid at issue here, in contrast to that in Witters, reaches a religious school solely as a result of a decision "made by the state" not the student. Witters, 474 U.S. at 488, 106 S.Ct. 748. Columbia Union would receive such funds as part of a general government program that distributes benefits to qualifying institutions directly. Cf. Witters, 474 U.S. at 488, 106 S.Ct. 748 ("any aid ultimately flowing to the Inland Empire School of the Bible" is not "resulting from a state action") (emphasis in original); Zobrest, 509 U.S. at 10, 113 S.Ct. 2462; Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 781, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) ("the fact that aid is disbursed to parents rather than schools" is a factor weighing against finding state program violates the Establishment Clause). Institutions, not students, apply for Sellinger funds, and the State determines the eligibility of institutions, not students, for the funds. The State then pays such funds directly to an institution which is, in turn, accountable to the State for the manner in which it spends such funds. See Md. Regs.Code tit. 13 B, § .01.02.05. Although the amount of Sellinger funds given to an institution is tied to the number of students attending it, the decision to fund the institution in the first instance is exclusively the State's.
 
 
 28
 Nor can the aid here be said to reach the college as an incidental benefit, as it did in Witters. Rather, the college is the "primary beneficiar[y]" of this direct aid, and the student, "to the extent [he] benefit[s] at all from" the Sellinger grants, is the "incidental beneficiar[y]." Zobrest, 509 U.S. at 12, 113 S.Ct. 2462; cf. id. ("Disabled children, not sectarian schools, are the primary beneficiaries" of services provided under IDEA; "to the extent sectarian schools benefit at all from the IDEA, they are only incidental beneficiaries."). Witters, a case confined to those situations where student choice, not state decisionmaking, results in an incidental benefit to a religious institution, does not overrule Roemer or alter its applicability to the case at hand.
 
 
 29
 Nor does Agostini overrule the Roemer holding. To be sure, like Witters, Agostini prohibits a court from concluding that any and all state aid to a pervasively sectarian institution impermissibly advances religion, and so to that extent is contrary to the broad Roemer dicta. Agostini, 117 S.Ct. at 2010-11; cf. Roemer, 426 U.S. at 747, 96 S.Ct. 2337 ("no state aid at all" is permissible). But Agostini does not undermine the holding in Roemer that the Establishment Clause permits the state to provide direct money payments ("noncategorical in nature") to a church-affiliated college to fund its secular educational purposes only if the college is not so "pervasively sectarian that secular activities cannot be separated from sectarian ones." Roemer, 426 U.S. at 740, 96 S.Ct. 2337.
 
 
 30
 In Agostini, the Court overruled Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), and, in part, School District of Grand Rapids v. Ball, 473 U.S. 373, 105 S.Ct. 3248, 87 L.Ed.2d 267 (1985), expressly rejecting the general proposition, stated in Ball and Aguilar (and Roemer ), that "all government aid that directly aids the educational function of religious schools is invalid." Agostini, 117 S.Ct. at 2011. The Agostini Court held that the Establishment Clause does not bar the government from sending public school teachers to provide remedial Title I services to disadvantaged children to "supplement[ ]" the core curriculum of "pervasively sectarian" grade schools. Id. at 2008, 2013. In reaching this conclusion, the Court analogized the remedial services before it to the vocational grant in Witters and the sign-language interpreter in Zobrest, reasoning that remedial instruction provided to "eligible recipients" also reaches the school "only as a result of the genuinely independent and private choices of" students or their parents. Id. at 2012 (quoting Witters, 474 U.S. at 487, 106 S.Ct. 748). Thus, such aid flowing to pervasively sectarian institutions, as a result of parents' choice to send these qualifying students to such a school, did not impermissibly advance religion. Id. at 2012.
 
 
 31
 In the face of objections in a vigorous dissent, the Agostini Court carefully explained the limits of its holding. First, it pointed out that the facts before it did not involve a situation (like our case or Roemer ) in which aid flows directly to "the coffers of religious schools" for services provided "on a school-wide basis." Id. at 2013. The Agostini Court further explained that providing remedial services did not impermissibly advance the schools' religious educational mission because those services were "supplemental to the regular curricula" taught to all students; Title I aid did not "supplant" or "reliev[e] sectarian schools of costs they otherwise would have borne in educating their students." Id. (quoting Zobrest, 509 U.S. at 12, 113 S.Ct. 2462); see also Committee for Pub. Educ. & Religious Liberty v. Regan, 444 U.S. 646, 656, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (upholding reimbursement to parochial schools for costs to administer and grade state-sponsored, state-mandated standardized testing that were separate and apart from, and thus supplemental to, the religious school's educational program, and not used for "religious educational purposes").
 
 
 32
 Thus, Agostini, the Court's most recent treatment of the Establishment Clause in the school funding context, holds that government aid flowing to even a pervasively sectarian institution does not impermissibly advance religion if it reaches the institution as a result of private independent choices of the individual rather than state decisionmaking, and if it "supplements" rather than "supplant[s]" the college's core educational functions. Agostini, 117 S.Ct. at 2013. But Agostini does not hold that government funding that directly flows to "the coffers of [a pervasively sectarian] religious school[ ]" to fund the entire budget for many of the college's core educational courses would survive an Establishment Clause challenge. Id. Agostini, therefore, does not disturb the central teaching of Roemer that when a college is so pervasively sectarian that its religious mission "permeates" its educational functions, the government cannot provide direct money grants even to fund the college's secular subjects because "religious and secular functions [a]re inseparable." Roemer, 426 U.S. at 750, 96 S.Ct. 2337.
 
 
 33
 Finally, Columbia Union's suggestion that Rosenberger overrules Roemer is particularly puzzling. As outlined above, Rosenberger clearly provides precedent helpful to Columbia Union on its free speech claim. But just as clearly, the Rosenberger Court's treatment of the Establishment Clause issue provides no support for Columbia Union's contention that it overrules Roemer. In fact, the Rosenberger Court took particular pains not to overrule Roemer, but to carefully distinguish it, explaining:
 
 
 34
 The Court of Appeals (and the dissent) are correct to extract from our decisions the principle that we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions, citing Roemer .... The error is not in identifying the principle but in believing that it controls this case . Even assuming that WAP is no different from a church and that its speech is the same as the religious exercises conducted in Widmar (two points much in doubt), the Court of Appeals decided a case that was, in essence, not before it, and the dissent would have us do the same. We do not confront a case where, even under a neutral program that includes nonsectarian recipients, the government is making direct money payments to an institution or group that is engaged in religious activity. Neither the Court of Appeals nor the dissent, we believe, takes sufficient cognizance of the undisputed fact that no public funds flow directly to WAP's coffers .
 
 
 35
 Rosenberger, 515 U.S. at 842, 115 S.Ct. 2510 (emphasis added; citations omitted).
 
 
 36
 The Rosenberger Court expressly found that Roemer did not apply in a case where the University provided an "incidental," indirect benefit (i.e., printing services) for all qualifying recipients, not "direct money payments" as was provided to the colleges in Roemer. Id. at 842, 844, 115 S.Ct. 2510. Thus, the Rosenberger majority chided the court of appeals and the dissent for relying on Roemer and other cases like it not because those cases were no longer good law, but because they dealt with a different issue--our issue: the Establishment Clause implications of a "neutral [state] program" providing "direct money payments to an institution" that may be "engaged in religious activity." Id. at 842, 115 S.Ct. 2510. The Rosenberger Court expressly found Roemer did not "control[ ]" the situation before it. Id.; see also id. at 840-41, 115 S.Ct. 2510 (payments "to private contractors for the cost of printing" differs from a "tax levied for the direct support of a church," which would be "contrary to" the Establishment Clause; "[o]ur decision ... cannot be read as addressing an expenditure from a general tax fund").
 
 
 37
 Distinguishing the "direct money payments" at issue in Roemer obviously was also critical to Justice O'Connor's necessary fifth vote in Rosenberger. She cited Roemer and emphasized in her separate concurring opinion that although "some government funding of secular functions performed by sectarian organizations" is permissible, "no precedent" allows "the use of public funds to finance religious activities" even if pursuant to a neutral government program that benefits religious and non-religious institutions alike. Id. at 847, 115 S.Ct. 2510. Justice O'Connor specifically rejected the view that Rosenberger "signals the demise of the funding prohibition in Establishment Clause jurisprudence." Id. at 852, 115 S.Ct. 2510. Rather, Justice O'Connor supported the continued vitality of Roemer, emphasizing that the program in Rosenberger did not violate the Establishment Clause in large part because funds did "not pass through the [religious] organization's coffers" and were not "a block grant to religious organizations." Id. at 850, 115 S.Ct. 2510. Were such the case (as contemplated in Roemer ), Justice O'Connor indicated that "the danger of impermissible use of public funds to endorse Wide Awake's religious message" would be evident. Id. at 852, 115 S.Ct. 2510.
 
 
 38
 The Rosenberger Court, therefore, could not have been clearer: the indirect funding at issue in Rosenberger and the direct provision of money grants in Roemer are two mutually exclusive, non-intersecting doctrines. Roemer is not "control[ling]" in the Rosenberger situation and Rosenberger does not "address[ ]" Roemer. Rosenberger, 515 U.S. at 841-42, 115 S.Ct. 2510.
 
 
 39
 Rosenberger not only fails to overrule Roemer, but like Witters and Agostini, it reaffirms, as the Court has on many other occasions, the distinction between direct and indirect government aid. The Court has repeatedly found this distinction critical when determining whether state aid to a "pervasively sectarian" institution would impermissibly advance religion. See, e.g., Agostini, 117 S.Ct. at 2013 (program did not violate Establishment Clause because aid is directed to students attending religious schools with no state funds "ever reach[ing] the coffers of religious schools"); Rosenberger, 515 U.S. at 841-42, 115 S.Ct. 2510 (university providing printing facilities for all qualified student publications confers indirect benefit to religiously affiliated magazine, and is not "a general public assessment assigned and effected to provide [direct] financial support for a church" because ... "no public funds flow directly to [magazine's] coffers"); Witters, 474 U.S. at 488, 106 S.Ct. 748 (vocational assistance "paid directly to the student" does not "provide ... financial support for nonpublic, sectarian institutions").
 
 
 40
 "[T]he form of [this direct] aid"--a money payment to the recipient organization rather than provision of equipment or services--heightens the danger that a state may impermissibly advance religion. Roemer, 426 U.S. at 749, 96 S.Ct. 2337; see also Agostini, 117 S.Ct. at 2015; Rosenberger, 515 U.S. at 843, 115 S.Ct. 2510. This is so because "the direct transfer of public monies," the most fungible and unrestricted type of aid, to an educational institution engaging in religious activities, particularly a pervasively sectarian institution, signifies "affirmative involvement characteristic of outright government subsidy." Nyquist, 413 U.S. at 774, 806-07, 93 S.Ct. 2955 (Rehnquist, J., concurring in part and dissenting in part) (quoting Walz v. Tax Comm'n, 397 U.S. 664, 690-91, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Brennan, J., concurring)); cf. Rosenberger, 515 U.S. at 844, 115 S.Ct. 2510 ("By paying outside printers" rather than directly paying student magazine its printing costs, "the University in fact attains a further degree of separation from the student publication."); Zobrest, 509 U.S. at 12-13, 113 S.Ct. 2462 (distinguishing provision of interpreter to disabled student under IDEA as permissible because purpose was not to provide "financial support for nonpublic, sectarian institutions" and could not be characterized as a "direct cash subsidy to a religious school" (emphasis added; internal citations and quotation marks omitted)).
 
 
 41
 The Supreme Court has never upheld a direct transfer of monies to a pervasively sectarian institution to fund its core educational functions. Moreover, in Roemer the Court concluded, in the context of the very program at issue here, that such a transfer would impermissibly advance religion.[3] Notwithstanding Columbia Union's contention to the contrary, the Supreme Court has never overruled Roemer. Rather, Roemer remains good law, and we, absent a clear directive from the Supreme Court, are duty bound to enforce it.
 
 IV.
 
 42
 Having determined that direct state funding of the general education courses of a "pervasively sectarian" institution would violate the Establishment Clause, we must now decide whether the district court properly held that Columbia Union is, as a matter of law, a "pervasively sectarian" institution.
 
 A.
 
 43
 In assessing whether an institution is "pervasively sectarian" a court must "paint a general picture of the institution, composed of many elements." Roemer, 426 U.S. at 758, 96 S.Ct. 2337. These "elements" are not clearly defined "absolutes of the physical sciences or mathematics," Tilton v. Richardson, 403 U.S. 672, 678, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), which can be applied like a "litmus-paper test," Regan, 444 U.S. at 662, 100 S.Ct. 840, to produce a definitive, unassailable result. Indeed, because the Supreme Court has never held any institution of higher education to be "pervasively sectarian," we lack even a clear "general picture" of a "pervasively sectarian" college or university.[4]
 
 
 44
 Nonetheless, Roemer and its progenitors, Tilton and Hunt, do provide us substantial guidance. In those cases, although the Supreme Court held that religiously affiliated colleges were not pervasively sectarian, it identified characteristics of a "pervasively sectarian" college. These characteristics fall into four general areas of inquiry: (1) does the college mandate religious worship, (2) to what extent do religious influences dominate the academic curriculum, (3) how much do religious preferences shape the college's faculty hiring and student admission processes, and (4) to what degree does the college enjoy "institutional autonomy" apart from the church with which it is affiliated. See generally Roemer, 426 U.S. at 755-58, 96 S.Ct. 2337; Hunt, 413 U.S. at 743-44, 93 S.Ct. 2868; Tilton, 403 U.S. at 685-86, 91 S.Ct. 2091.
 
 
 45
 The Court has never discussed the relative importance of these factors. Clearly, though, no one of them in isolation is dispositive. For example, although "Catholic religious organizations ... governed" all the colleges in Tilton, their lack of institutional autonomy simply constituted one factor in favor of finding them pervasively sectarian. Tilton, 403 U.S. at 686-87, 91 S.Ct. 2091. Similarly, the colleges at issue in Roemer required students to take certain religion courses, but this fact alone did not render them pervasively sectarian. Roemer, 426 U.S. at 756, 96 S.Ct. 2337.
 
 
 46
 A careful reading of Roemer, Tilton, and Hunt leads to the inescapable conclusion that even colleges obviously and firmly devoted to the ideals and teachings of a given religion are not necessarily "so permeated by religion that the secular side cannot be separated from the sectarian." Roemer, 426 U.S. at 759, 96 S.Ct. 2337 (quoting Roemer v. Board of Pub. Works of Md., 387 F.Supp. 1282, 1293 (D.Md.1974)). Indeed, the Supreme Court has set the bar to finding an institution of higher learning pervasively sectarian quite high. We believe that to find religion pervades a college to such a degree that religious indoctrination thoroughly dominates secular instruction, the college must in fact possess a great many of the following characteristics: mandatory student worship services; an express preference in hiring and admissions for members of the affiliated church for the purpose of deepening the religious experience or furthering religious indoctrination; academic courses implemented with the primary goal of religious indoctrination; and church dominance over college affairs as illustrated by its control over the board of trustees and financial expenditures. See generally Roemer, 426 U.S. at 755-58, 96 S.Ct. 2337; Hunt, 413 U.S. at 743-44, 93 S.Ct. 2868; Tilton, 403 U.S. at 685-86, 91 S.Ct. 2091; see also Ball, 473 U.S. at 384 n. 6, 105 S.Ct. 3248; Meek v. Pittenger, 421 U.S. 349, 356, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); Nyquist, 413 U.S. at 767-68, 93 S.Ct. 2955; Lemon, 403 U.S. at 615-18, 91 S.Ct. 2105.
 
 
 47
 These elements should not be read as a "pervasively sectarian" template that, when placed over every religiously affiliated college, precisely determines the degree of its religiosity. Matters as difficult and important can never be so easily resolved. Rather, we set them out to provide some guidance and to clarify that the Supreme Court regards a "pervasively sectarian" college as a rarity, to be so designated only after a thorough and searching inquiry.
 
 
 48
 Maintaining the delicate balance required by the First Amendment's Religion Clauses always presents a task fraught with difficulty. Deciding whether religion so pervades an institution of higher learning that a "substantial portion of its functions are subsumed in the religious mission," Hunt, 413 U.S. at 743, 93 S.Ct. 2868, mandates particularly careful analysis. What the Supreme Court has said and done--and what it has not said and done--suggest that a court should approach this task with an appreciation of the political process and realization that ours is a society made rich by religious and philosophical diversity. When duly elected political leaders determine for good and sufficient secular purposes that they wish to provide government funding to assist private institutions of higher learning (including private religious institutions) with secular academic pursuits, a court cannot upset that decision unless, after examining all of the evidence in light of the above factors, it determines that an institution is truly "pervasively sectarian."
 
 
 49
 With these principles in mind, we turn to the district court's decision.
 
 B.
 
 50
 The district court took careful note of the appropriate areas of inquiry and conscientiously attempted to apply the Supreme Court's directives to the facts before it. However, for the reasons set forth below, we believe the court erred in concluding that application of the law to those facts warranted the grant of summary judgment to the State. We note that summary judgment is only proper if there is no dispute as to "any material fact," Fed.R.Civ.P. 56(c), or as to the reasonable inferences that can be drawn from the facts. See M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir.1992) (en banc). Where the party challenging the grant of summary judgment can "show that the inferences they suggest are 'reasonable in light of the competing inferences,' " summary judgment must be denied. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
 
 
 51
 With regard to the first factor, mandatory attendance at religious worship services, the district court noted that Columbia Union has an official policy of once-weekly mandatory prayer services for resident students and three out of six smaller meetings for these same students in their dormitories. See Columbia Union, 988 F.Supp. at 902. Students can face disciplinary proceedings for failure to attend a certain number of such meetings. Id. These mandatory prayer services do, as the district court held, weigh in favor of finding the college pervasively sectarian. Id. Columbia Union, however, points to additional evidence demonstrating the "mandatory" nature of its policy may not be as compulsory as the words suggest. The policy only applies to students under the age of 23 who attend classes during the day and live in resident halls. This limitation, combined with Columbia Union's liberal excuse policy, results in only about 350 to 400 of Columbia Union's 1172 students being required to attend services. Well over half of the student body, therefore, is not so compelled.
 
 
 52
 A reasonable fact finder could find the college's mandatory prayer policy, requiring attendance at religious services of the vast majority of its resident students, reveals that Columbia Union is primarily interested in religious indoctrination at the expense of providing a secular education. Cf. Roemer, 426 U.S. at 755, 96 S.Ct. 2337 (even though Roman Catholic chaplains employed by the colleges conducted religious exercises on campus, attendance was not required and the district court found "religious indoctrination [wa]s not a substantial purpose or activity of" the colleges (quoting Roemer, 387 F.Supp. at 1282, 1293)). However, a fact finder could also reasonably infer that Columbia Union's mandatory prayer policy has a limited reach, suggesting that while religious principles are important to the college, they are not so important as to warrant a finding that "religious indoctrination" is more than a "secondary objective." Id. Where both reasonable inferences coexist, on the State's motion for summary judgment a court must credit the inference most favorable to Columbia Union.
 
 
 53
 As to the second Roemer factor, the district court concluded for several reasons that religion dominates the college's academic courses. Initially, the court relied on two statements found in the college's 1996-97 bulletin--the religion department "believes that in a Christian college, Christian principles should characterize every phase of college life, whether it be intellectual, physical, social, or moral"; and the religion faculty, through "their dedication to Jesus Christ," seeks to "show [students] how Christian principles offer satisfactory answers to the perplexing problems facing the world today." The court ruled that the college's mandatory religion courses, taught by a faculty governed by these principles, "contribute to an overall mosaic that is pervasively sectarian." Columbia Union, 988 F.Supp. at 902.
 
 
 54
 The problem with this inference is that the Roemer Court expressly held that mandatory religion courses do not necessarily constitute evidence that a college is "pervasively sectarian" because they may "only supplement a curriculum covering 'the spectrum of a liberal arts program.' " Roemer, 426 U.S. at 757, 96 S.Ct. 2337 (quoting Roemer, 387 F.Supp. at 1288). Columbia Union's course bulletin reveals that, like the colleges in Roemer, it offers a wide variety of traditional liberal arts courses, e.g., biology, chemistry, physics, nursing, history, philosophy, psychology. Neither party introduced any evidence--one way or the other--about how these traditional liberal arts or mandatory religion courses are taught. Without such evidence, the religion department's general mission statements cannot support only one plausible conclusion, namely that the courses at Columbia Union predominantly focus on "deepening students' religious experiences." Columbia Union, 988 F.Supp. at 902. Rather, an equally plausible inference is that the college predominantly exposes its students to a wide variety of academic disciplines, including religious teachings.
 
 
 55
 In concluding that Columbia Union stifles academic freedom on its campus, the district court also relied on statements in the college's faculty handbook directing the faculty to "bear in mind their peculiar obligation as Christian scholars and members of a Seventh-day Adventist College" and noting that they have "complete freedom so long as their speech and actions are in harmony with the philosophies and principles of the college--a Seventh-day Adventist institution of higher education." Id. Again, the district court read these statements in the light least, rather than most, favorable to Columbia Union. If these statements are consistent with the 1940 Statement of Principles on Academic Freedom of the American Association of University Professors, as Columbia Union asserts, then they provide no proof that the college's religious mission impinged too greatly on its academic freedom. This is so because the Supreme Court has expressly credited compliance with the 1940 statement as evidence demonstrating that a college permits "intellectual freedom" despite its religious affiliation. See Roemer, 426 U.S. at 756, 96 S.Ct. 2337; Tilton, 403 U.S. at 681-82, 91 S.Ct. 2091.
 
 
 56
 The district court also concluded that descriptions in the college bulletin of several "nominally secular academic departments are replete with references to secular religion" and that these references constituted evidence of a lack of academic freedom. Columbia Union, 988 F.Supp. at 903. Notably, the district court highlighted one of the business department's statements announcing its goal to instill in students "an approach to people, work, and life that demonstrates outstanding Christian values and ethics." Id. This religious reference is one of only two found in the bulletin's business department section, which spans over ten pages. These passages do supply evidence to support a reasonable inference that the school crafts its teachings based on religious principles of the Seventh Day Adventist Church. However, the remainder of the business department section contains no religious commentary, and reads much like the following passage:
 
 
 57
 The business curriculum combines a challenging liberal arts education with a strong foundation in business. Students receive a broad-based education, interweaving courses in the arts, sciences, and humanities with a professional education that will enable them to influence the community through competent and caring service. Through their business classes, they gain solid grounding in business fundamentals and depth in individual areas of concentration. Analytical and communications skills are emphasized across the business curriculum.[5]
 
 
 58
 In context, the religious references are simply not enough, in number or in nature, to compel the inference that Columbia Union's attempts at religious indoctrination compromise its academic freedom.
 
 
 59
 As to the third Roemer factor, the district court held that "faculty hiring and student admissions decisions do not appear to be made without regard to religion." Id. at 903 (emphasis added). This may be so but facts, not appearances, count here. No facts mandate the court's ultimate conclusion that "religion plays a role in faculty hiring and student admissions decisions." Id. True, as the district court noted, 36 of 40 full time faculty members are Seventh Day Adventists and the college's literature states it reserves the right "to give preference" to members of the Seventh Day Adventist Church in its hiring decisions. Id. However, when part-time instructors are included, only fifty-seven percent of the faculty are Adventists, and the record is silent on whether the college in fact exercises its right to prefer Adventists for faculty positions. The record is also silent on the college's hiring procedures, the criteria it applies, and the nature of the applicant pool. We simply do not know anything about how or why the college selects its faculty. Thus, this slim record does not mandate the conclusion that a college, widely known for its affiliation with the Seventh Day Adventist Church, in fact exercises a hiring preference for Seventh Day Adventists.
 
 
 60
 Nor does the fact that Columbia Union asks its students to evaluate their professors based in part on whether a professor stresses Christian values and philosophy in the classroom require this conclusion. This evidence certainly suggests that the college expects classes to be conducted with Christian teachings in mind, but it says nothing about the criteria employed for hiring faculty, i.e., whether Columbia Union is making a conscious effort to "stack its faculty with members of a particular religious group." Roemer, 426 U.S. at 757, 96 S.Ct. 2337 (internal quotation marks and citations omitted). Implicit in the district court's conclusion as to faculty hiring is the view that a college's exercise of a religious preference in hiring under all circumstances weighs in favor of finding that a school is pervasively sectarian. The Roemer Court rejected this view. Rather, a college can follow a religious preference in hiring when it demonstrates its intent to do so for reasons other than "stack[ing]" the faculty with members of its affiliated religious order. Id.; cf. id. (noting "[b]udgetary considerations" prompting col leges to "favor members of religious orders, who often receive less than full salary" reveal that preference was not designed to further any religious mission).
 
 
 61
 The district court similarly concluded that religion "plays a role ... in student admissions decisions," Columbia Union, 988 F.Supp. at 903, relying on the following evidence: (1) eighty percent of the college's full-time students and twenty percent of its part-time students are Seventh Day Adventist, (2) the college asks applicants their religious affiliation, and (3) the college bulletin states it "welcomes applications from all students whose principles and interests are in harmony" with those of Columbia Union. Although this evidence certainly provides possible proof of religious preference in admission policies, it does not mandate that conclusion.
 
 
 62
 As the district court itself acknowledged, that a "great majority" of students are affiliated with a church does not conclusively support finding a college pervasively sectarian. Id. at 903 (citing Roemer, 426 U.S. at 757, 96 S.Ct. 2337); see also Hunt, 413 U.S. at 743-44, 93 S.Ct. 2868 (noting that sixty percent of student body affiliated with Baptist church reflected demographics of surrounding area, not college exercising a religious preference). Indeed, Roemer instructs a trial court to conduct a "thorough analysis of the student admission and recruiting criteria" to determine whether such a preference is in fact exercised. Roemer, 426 U.S. at 757, 96 S.Ct. 2337 (internal quotation marks and citations omitted). The district court failed to do this.
 
 
 63
 Nor can we, after a full review of the record before us, determine the college's "admissions and recruiting criteria," and whether they include a preference for Seventh Day Adventists. That the college bulletin encourages applicants with similar "principles and interests" to apply does not necessarily signal that students should do so only if they are affiliated with the Seventh Day Adventist Church. Indeed, this statement gains meaning only in light of the college's actual "principles and interests." Much of Columbia Union's published material reflects the college's endorsement of both religious and nonreligious "principles and interests." For example, the college bulletin discusses the importance of "academic honesty" in its student body, emphasizing that plagiarism or cheating is strictly prohibited. This statement, to be sure, illustrates a "principle" or "interest" of the school, but not one that is pervasively sectarian or even overtly connected to the teachings of the Seventh Day Adventist Church. Thus, based on this evidence, a reasonable factfinder could conclude that Columbia Union may or may not exercise a religious preference in admissions; on summary judgment, we must credit the inference most favorable to Columbia Union.
 
 
 64
 Finally, the district court determined that "Columbia Union is not 'characterized by a high degree of institutional autonomy' as were the colleges in Roemer." Columbia Union, 988 F.Supp. at 901 (quoting Roemer, 426 U.S. at 755, 96 S.Ct. 2337). The court based this conclusion on Columbia Union's receipt of a gift from the Seventh Day Adventist Church of $2.5 million (or 21.5% of its total unrestricted educational and general revenues budget) and the fact that under the college's by-laws, 34 of 38 members of the Board of Trustees must be members of the Seventh Day Adventist Church. Id.
 
 
 65
 These facts undeniably demonstrate that Columbia Union enjoys less autonomy than the colleges in Roemer. Cf. Roemer, 426 U.S. at 755, 96 S.Ct. 2337 (although Catholic Church representatives served on the colleges' governing boards, "none of the four receive[d] funds from, or makes reports to, the Catholic Church"). However, as the district court itself recognized, the Supreme Court held that the colleges at issue in Tilton and Hunt were not pervasively sectarian even though they were "arguably under more control by their affiliated church than" Columbia Union. Columbia Union, 988 F.Supp. at 901; see also Hunt, 413 U.S. at 743, 93 S.Ct. 2868 (Baptist Convention elected college board of trustees, approved certain financial transactions, and was the only body permitted to amend college charter); Tilton, 403 U.S. at 686, 91 S.Ct. 2091 ("All four schools are governed by Catholic religious organizations."). As in Hunt and Tilton, the college's relative lack of institutional autonomy is a factor to be weighed in favor of finding it pervasively sectarian, but it is no more determinative here than it was in Hunt or Tilton.[6]
 
 
 66
 In sum, the district court's grant of summary judgment to the State suffered from two fatal flaws. First, the court rested its conclusion that Columbia Union is "pervasively sectarian" on an incomplete record, and second, the court often considered those facts that it did have before it in the light least, rather than most, favorable to Columbia Union. Accordingly, we must remand to the district court for further proceedings.
 
 C.
 
 67
 We recognize that the parties have asserted, both before the district court and us, that no material facts were disputed and so the case was ripe for summary judgment. Although such statements are of interest, they cannot and do not establish the propriety of deciding a case on summary judgment. See World-Wide Rights Ltd. Partnership v. Combe, Inc., 955 F.2d 242, 244 (4th Cir.1992) (simply because both parties move for summary judgment "does not 'establish that there is no issue of fact' " requiring " 'that summary judgment be granted to one side or another' " (quoting American Fidelity Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir.1965))). Particularly when deciding difficult constitutional questions dependent on intensely factual determinations, as in the case at hand, a court must assure itself that it has before it a full and complete factual record. See, e.g., Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).
 
 
 68
 Thus, in deciding the difficult question presented here, the Supreme Court has consistently so assured itself of precisely this. The Court has often noted district court's diligence in holding lengthy evidentiary hearings and making numerous factual findings to determine whether an institution was "pervasively sectarian." See, e.g., Ball, 473 U.S. at 380, 384, 105 S.Ct. 3248 (after an "8-day bench trial" the district court made factual findings based on a record of "massive testimony and exhibits" (internal quotation marks omitted)); Roemer, 426 U.S. at 755-58, 96 S.Ct. 2337 (Court quotes district court's numerous detailed factual findings, which were based on a "record of thousands of pages, compiled during several weeks of trial"); Lemon, 403 U.S. at 609, 615, 91 S.Ct. 2105 ("[t]he District Court made extensive findings" after a hearing "at which extensive evidence was introduced" "concerning the nature of the secular instruction" offered at the schools).
 
 
 69
 Conversely, in Bowen v. Kendrick, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), when a district court did attempt to resolve this question on summary judgment, the Supreme Court reversed and remanded for additional factfinding. In Bowen, the district court had determined that a federal statute providing funds for programs to reduce teen pregnancy violated the Establishment Clause both facially and as applied.[7] With respect to the "as applied" challenge, the Court held that the district court "did not follow the proper approach in assessing" the claim that government funding violated the Establishment Clause. Id. at 620, 108 S.Ct. 2562. The Court criticized the district court for failing to explore with "any particularity" evidence that would "warrant[ ] classification" of the institutions "as 'pervasively sectarian.' " Id.
 
 
 70
 The only evidence before the district court in Bowen was written "by-laws [and] policies that prohibit any deviation from religious doctrine" and evidence demonstrating "explicit corporate ties" to a religious organization. Id. at 620 n. 16, 108 S.Ct. 2562. The Supreme Court stressed that although such evidence was "relevant to the determination of whether an institution is pervasively sectarian, [it was] not conclusive." Id. (emphasis added; internal quotation marks omitted). Accordingly, the Court remanded the case to the district court with directions to engage in further factfinding, bearing in mind that under Tilton, Hunt, and Roemer, "it is not enough to show that the recipient of a challenged grant is affiliated with a religious institution or that it is 'religiously inspired.' " Id. at 621, 108 S.Ct. 2562. Bowen, therefore, calls into question any determination, made at the summary judgment stage, that an institution is "pervasively sectarian" based largely on "by-laws" and "policy" statements. Id.
 
 
 71
 Finally, in Roemer itself the Court made clear that, to find an institution pervasively sectarian, a trial court must consider not only the institution's written literature, policies, and statements, but also its practices. See Roemer, 426 U.S. at 756, 96 S.Ct. 2337 (citing Roemer, 387 F.Supp. at 1293 (evidence of "uncontroverted faculty testimony" demonstrated that faculty taught without fear of religious pressures in "classroom presentations or their selections of texts or course materials")); see also Tilton, 403 U.S. at 681, 91 S.Ct. 2091 (although those challenging government aid "introduced several institutional documents on what could be taught, other evidence showed that these restrictions were not in fact enforced " (emphasis added)). Although in this case the district court considered many of Columbia Union's written policies, it did not begin to explore the college's practices pursuant to those policies.
 
 
 72
 In sum, notwithstanding the parties' views, determination of this case on summary judgment on this record is impossible.[8] Neither the Supreme Court, nor any circuit court to our knowledge, has ever found a college to be pervasively sectarian. The decision is not a simple one. The criteria for assessing whether an institution is pervasively sectarian are complex, elusive, and heavily fact intensive. Given the "far-flung import" of this case, Kennedy, 334 U.S. at 257, 68 S.Ct. 1031, no court could or should decide whether Columbia Union is pervasively sectarian based solely on the evidence in this record, which is comprised almost exclusively of the college's written literature and policies. Controlling Supreme Court law, as well as common sense, mandate that a court review not only the college's written policies, but also its practices, to determine whether religious indoctrination pervades the institution. We remand the case to the district court so that it can have an opportunity to make the requisite full and careful determinations necessary here.
 
 
 73
 VACATED AND REMANDED.
 
 WILKINSON, Chief Judge, dissenting:
 
 74
 The majority sidesteps the central issue in this case by sending it back to district court for yet another round in a seemingly endless dispute over Columbia Union College's claim to funding under Maryland's Sellinger Program. The legal question that should be confronted now--and not avoided by a remand--is whether the discriminatory treatment of Columbia Union on the basis of its religious viewpoint is compelled by the Establishment Clause.
 
 
 75
 The majority remands despite the fact that the parties submitted this case below on cross-motions for summary judgment. Both sides agree that no material facts are in dispute. Contrary to the majority, I believe the agreed-upon facts provided the district court with more than an adequate basis to reach its decision.
 
 
 76
 Most importantly, by remanding for intensive factfinding, the majority unduly burdens both parties. It apparently would require district courts to leave no stone unturned in Establishment Clause inquiries into whether educational institutions are properly considered pervasively sectarian. The majority sets the stage for what should prove to be a relentless inquisition into the religious practices of Columbia Union, its teachers, and its students. To obtain funding, Columbia Union will have little choice but to mold itself to an exhaustive template of "non-sectarianess," jettisoning in the process many of the beliefs and practices that it holds most dear. For these reasons, I believe the result reached by the majority is not only unnecessary, but also threatening to important values inherent in the First Amendment's speech and religion clauses.
 
 I.
 A.
 
 77
 Maryland's denial of funding to Columbia Union on the basis of its religious viewpoint is a denial of the right to freedom of speech under the First Amendment. Maryland's Sellinger Program exists to support private higher education generally. Funding is thus available to any nonpublic institution of higher education that meets neutral statutory requirements. In this sense, Maryland has created a limited forum in much the same way as the Supreme Court in Rosenberger found the University of Virginia had by funding a diversity of views in students' extracurricular activities. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 824, 830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).[1] Yet even within such a limited forum, the State may not "discriminate against speech on the basis of its viewpoint." Id. at 829, 115 S.Ct. 2510; see Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 392-93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). Because the State restricts speech on the basis of "the specific motivating ideology or the opinion or perspective of the speaker," Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510, viewpoint discrimination is uniquely antithetical to First Amendment ideals of freedom of belief and expression. Government must not be permitted to silence one side of a debate, in this case the religious perspective, while permitting other more favored views to flourish unopposed. See R.A.V. v. City of St. Paul, 505 U.S. 377, 391-92, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).
 
 
 78
 Columbia Union has done everything that Maryland has asked of every institution it funded. Indeed, if it were any other institution, funding would be coming its way. The college has satisfied each of the neutral statutory requirements for participation in the Sellinger Program. Specifically, Columbia Union is a nonprofit private college that was established in Maryland before 1970; it is approved by the Maryland Higher Education Commission (MHEC); it is accredited by the Commission on Higher Education of the Middle States Association of Colleges and Schools; it has awarded associate of arts or baccalaureate degrees to at least one graduating class; it maintains earned degree programs other than seminarian or theological ones; and it has submitted its program to the MHEC for review. Furthermore, Columbia Union's president has pledged by sworn affidavit, as required by MHEC regulations, that any aid received through the Sellinger Program will not be used for sectarian purposes.
 
 
 79
 Maryland has thus denied funding to Columbia Union for one reason only--its sectarian character. By denying Columbia Union funding on the basis of its sectarian approach to education, Maryland has impermissibly discriminated against the college on the basis of its religious point of view. This finding sets the stage for the critical question in this case: whether Maryland's viewpoint discrimination is justified by its need to comply with the Establishment Clause. See Rosenberger, 515 U.S. at 837, 115 S.Ct. 2510.
 
 B.
 
 80
 In an earlier era of Establishment Clause jurisprudence, it was perfectly clear that Columbia Union had no claim to funding. In Roemer v. Board of Public Works, 426 U.S. 736, 755, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality opinion), the Supreme Court held that the Establishment Clause prohibits government aid "to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones." Three years earlier in Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the Court had explained that "[a]id normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission...." The Court reaffirmed this principle in Bowen v. Kendrick, 487 U.S. 589, 610, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), explaining that "[o]ne way in which direct government aid might have [the primary effect of advancing religion] is if the aid flows to institutions that are 'pervasively sectarian.' "
 
 
 81
 But Establishment Clause jurisprudence has changed since Hunt, Roemer, and Bowen. The general funding prohibition announced in those decisions has gradually been relaxed to permit government aid to religious institutions and organizations when accomplished through neutral government programs. Columbia Union contends that the Court's more recent neutrality principle has in fact supplanted the Court's prior funding prohibition decisions and should govern our case today. The college claims that because Maryland's Sellinger Program awards funding to private institutions of higher education under neutral criteria, without regard to the institution's sectarian or nonsectarian character, the provision of funds to Columbia Union cannot offend the Establishment Clause.
 
 
 82
 As a matter of prediction, Columbia Union may be right. There is no question that the neutrality principle is on the rise. Beginning with its decision in Witters v. Washington Department of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), the Supreme Court has frequently turned to a neutrality principle in assessing Establishment Clause challenges to state aid programs. If the program by which a religious institution receives assistance is neutral, in that it extends benefits to a wide range of recipients without regard to their religious nature, it normally will survive an Establishment Clause challenge. In Witters, for example, the Court upheld the provision of state funds for a blind student's education at a bible college to become "a pastor, missionary, or youth director." Id. at 483, 106 S.Ct. 748. Of importance to the Court was the fact that the aid in question was given under a general vocational rehabilitation program. The Court therefore explained its decision as resting in part on the fact that the aid was "made available generally without regard to the sectarian-nonsectarian, or public nonpublic nature of the institution benefited." Id. at 487, 106 S.Ct. 748 (internal quotation marks omitted).
 
 
 83
 The neutrality principle became more pronounced in Zobrest v. Catalina Foothills School District, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), where the Court again approved aid in support of education at a pervasively sectarian educational institution. The Court specifically held that the Establishment Clause was not violated by the provision of an interpreter to a deaf student attending a Roman Catholic high school. The Court noted: "[W]e have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit." Id. at 8, 113 S.Ct. 2462.
 
 
 84
 Next came Rosenberger, in which the Supreme Court again strengthened the neutrality principle: "A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion." 515 U.S. at 839, 115 S.Ct. 2510. The Court contributed to the quickening rise of the neutrality principle by holding that the Establishment Clause is not offended when the government extends benefits to recipients with religious viewpoints, so long as the benefit program is governed by neutral criteria. "More than once have we rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design." Id. Applying the neutrality principle, the Court again upheld the funding of religion--in this case a printer for a religious publication at the University of Virginia. Id. at 845-46, 115 S.Ct. 2510.
 
 
 85
 Then in Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Court took a giant step toward neutrality by actually overruling one of its prior funding prohibition decisions. See Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). Specifically, the Court upheld a federally funded program under which disadvantaged children were provided remedial education on the premises of sectarian schools by government employees. The Court noted with approval its prior decisions "sustain[ing] programs that provided aid to all eligible children regardless of where they attended school." 117 S.Ct. at 2014. Significantly, the Court justified its decision to disregard precedent by noting the dramatic shift in its Establishment Clause jurisprudence since the 1985 Aguilar decision. Agostini, 117 S.Ct. at 2017.
 
 
 86
 Finally, the emergent neutrality principle already has found its place in the Free Exercise Clause. Specifically, in Employment Division v. Smith, the Court noted that it has "consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (emphasis added) (internal quotation marks omitted). The Court went on to hold that Oregon could deny unemployment benefits to individuals whose dismissal resulted from the use of drugs made illegal under Oregon law. The application of the neutrality principle under the Establishment Clause, therefore, would bring both of the religion clauses into step.
 
 
 87
 The neutrality principle that courses through the Court's recent decisions certainly would not forbid Maryland from funding Columbia Union under the Sellinger Program. As already noted, Maryland provides funding generally to private institutions of higher education, without regard to their sectarian or nonsectarian character. Indeed, three of the institutions that participated in the program during fiscal year 1997 were affiliated with the Roman Catholic Church. The Maryland program also requires that the recipient institution not use any of the funds received for sectarian purposes.
 
 
 88
 To hold that Maryland must refuse Columbia Union funding while allowing it to extend aid to other religious institutions would violate the very principle of neutrality required by the Establishment Clause. See Rosenberger, 515 U.S. at 845-46, 115 S.Ct. 2510; Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 707, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("[I]t is clear that neutrality as among religions must be honored."). The denial of state aid to only certain types of religious institutions--namely, pervasively sectarian ones--exposes government to accusations of religious favoritism. Nowhere is this more evident than in the administration of Maryland's Sellinger Program: Colleges affiliated with the Roman Catholic Church have been approved while Columbia Union, a Seventh-day Adventist institution, has been rejected. For the sake of avoiding the mere potential that secular aid will somehow advance sectarian objectives, Maryland has directly violated a different core principle of the Establishment Clause, the requirement of nondiscrimination among religions. Just as all private institutions should be treated neutrally, so should all religious viewpoints be treated similarly. Maryland's program now does neither of these things. Because the Sellinger Program violates the Supreme Court's recent neutrality principle in two respects, I would unhesitatingly find Columbia Union's pervasively sectarian character irrelevant and reverse the judgment of the district court.
 
 C.
 
 89
 We do not, however, write on so clean a slate. The funding prohibition principle is hanging on, if only by its fingernails. Although the Court has repeatedly upheld government aid to religious institutions on the basis of the neutrality of the program under which it is provided, the Court has notably failed to expressly overrule its prior decisions in Hunt, Roemer, and Bowen. Moreover, Witters, Zobrest, Rosenberger, and Agostini are all distinguishable from the precise case before us today.
 
 
 90
 In Witters and Zobrest, the Court focused on the fact that the state aid was given directly to the student rather than to the religious school. Zobrest, 509 U.S. at 10, 113 S.Ct. 2462; Witters, 474 U.S. at 487, 106 S.Ct. 748. This ensured that any aid ultimately flowing to the religious institutions did "so only as a result of the genuinely independent and private choices of aid recipients." Witters, 474 U.S. at 487, 106 S.Ct. 748; see also Zobrest, 509 U.S. at 10-11, 113 S.Ct. 2462. In fact, Zobrest is further distinguished by the fact that no direct cash subsidy was involved and thus no government funds ever reached the coffers of the sectarian high school. 509 U.S. at 10, 113 S.Ct. 2462. In contrast, the Court's decisions in Hunt, Roemer, and Bowen implicated various forms of direct funding of the religious institutions themselves. As Maryland's program provides a direct subsidy to religious schools, it must be evaluated under these prior decisions.
 
 
 91
 Rosenberger likewise failed to overrule the earlier Hunt-Roemer-Bowen trilogy. The rule against direct funding of pervasively sectarian institutions did not apply in Rosenberger because no public monies flowed directly into the coffers of the religious publication; all payments were made to a third-party printer. Id. at 843, 115 S.Ct. 2510. Noting the potential relevance of the prior funding prohibition cases, the Court explained that it was "correct to extract from our decisions the principle that we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions," id. at 842, 115 S.Ct. 2510, and cited Bowen, Roemer, and Hunt as examples of such decisions. The Court also found its prior funding prohibition decisions distinguishable for "the additional reason that the student publication is not a religious institution, at least in the usual sense of that term as used in our case law." Id. at 844, 115 S.Ct. 2510. And if each of these clues were not sufficient to distinguish Rosenberger from the case we face today, Justice O'Connor clearly indicated in her concurrence that the Court's decision "neither trumpet[ed] the supremacy of the neutrality principle nor signal[ed] the demise of the funding prohibition in Establishment Clause jurisprudence." Id. at 852, 115 S.Ct. 2510 (O'Connor, J., concurring). Thus, the abrogation of Hunt, Roemer, and Bowen would have to await another day.
 
 
 92
 Agostini similarly failed to overrule the funding prohibition announced in those three decisions. In Agostini, the Court held that public employees working on the premises of sectarian schools could not be presumed to inculcate religious beliefs in the students. 117 S.Ct. at 2012. The Court, however, did not hold that the funding of pervasively sectarian schools--in which the schools' own employees teach the students--cleared the First Amendment's hurdles. As in Zobrest and Rosenberger, the Court relied on the fact that no federal funds ever reached the coffers of the participating religious schools. Agostini, 117 S.Ct. at 2013.
 
 
 93
 Most importantly, the Court in Agostini sent an unmistakable message to lower courts that shifts in the Supreme Court's Establishment Clause jurisprudence should not be interpreted as signifying that its prior decisions have indirectly been overruled:
 
 
 94
 We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."
 
 
 95
 Id. at 2017 (quoting Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Our case clearly falls within that proscription. Although the funding prohibition announced in Hunt, Roemer, and Bowen appears to rest on reasoning now rejected by the Court in numerous applications of the neutrality principle, those three decisions have not been overruled, and they directly control here. It would in fact be difficult to find a case more directly controlling than Roemer, as it involved the exact same Maryland program that we face here. It is not our role to read the jurisprudential tea leaves. Bowen, Roemer, and Hunt remain the law and they require this court to uphold Maryland's denial of funding to Columbia Union if it is a pervasively sectarian institution.
 
 II.
 A.
 
 96
 The district court found, both on the basis of the parties' lengthy evidentiary submissions and prior findings by the MHEC, that Columbia Union is a pervasively sectarian institution. I simply fail to understand how the majority can conclude that the extensive evidentiary record before the district court was so lacking that we must remand this case for further factfinding. The majority's decision is especially puzzling considering that the very religious institution claiming entitlement to funding agreed before the district court that no material facts were in dispute and, therefore, that disposition of this case at the summary judgment stage was appropriate.
 
 
 97
 Initially, the majority can point to no decision that requires that specific types of evidence be presented to a district court before it can properly find an institution pervasively sectarian.[2] Indeed, although the Supreme Court opinions addressing the subject rely on several common factors, no one inquiry has been mandated. To determine whether an institution is pervasively sectarian, "it is necessary to paint a general picture of the institution, composed of many elements." Roemer, 426 U.S. at 758, 96 S.Ct. 2337 (emphasis added). Elements previously examined by the Supreme Court include the extent to which the religious institution is affiliated with or controlled by a church, see id. at 755, 96 S.Ct. 2337; Hunt, 413 U.S. at 743, 93 S.Ct. 2868; whether religious indoctrination is one of the institution's purposes, see Roemer, 426 U.S. at 755, 96 S.Ct. 2337; whether the school is characterized by an atmosphere of academic freedom, see id. at 756, 96 S.Ct. 2337; whether the institution encourages or requires prayer, see id. at 756-57, 96 S.Ct. 2337; whether there are religious qualifications for faculty hiring or student admissions, see id. at 757-58, 96 S.Ct. 2337; Hunt, 413 U.S. at 743-44, 93 S.Ct. 2868; and the religious makeup of the student population, see Roemer, 426 U.S. at 757-58, 96 S.Ct. 2337; Hunt, 413 U.S. at 744, 93 S.Ct. 2868.
 
 
 98
 As the majority concedes, the district court "took careful note of the appropriate areas of inquiry and conscientiously" considered evidence on each and every one of these factors. Ante at 164. Among its more significant conclusions, the district court found that Columbia Union was closely affiliated with, if not to a great extent controlled by, the Seventh-day Adventist Church; that Columbia Union's religious mission is furthered in part by requirements that students attend weekly chapel sessions and worship options in the residence halls; and that descriptions of even the college's secular courses were pervaded with religious references. The district court concluded that, in combination, the undisputed evidence under the several factors supported the conclusion that Columbia Union is a pervasively sectarian institution. I believe that the considerable evidence relied upon by the district court revealed no genuine dispute of material fact and, therefore, was more than sufficient to establish that Columbia Union is a pervasively sectarian institution.
 
 
 99
 By contrast, the majority erroneously flyspecks Columbia Union's characteristics. Rather than "paint[ing] a general picture of [Columbia Union]," Roemer, 426 U.S. at 758, 96 S.Ct. 2337 (emphasis added), the majority picks and scratches at each individual factor. It is not surprising that it determines that no particular factor conclusively establishes Columbia Union's sectarian nature. After all, "[t]he relevant factors ... are to be considered cumulatively." Roemer, 426 U.S. at 766, 96 S.Ct. 2337 (internal quotation marks omitted). The majority's methodology, while not wholly irrelevant, is overly focused; it simply turns its microscope to too high a power.
 
 
 100
 Finally, the majority points to Bowen to bolster its claim that cases of this sort are inappropriate for summary judgment. Ante at 169. It is true that the Court in Bowen remanded for additional factfinding. The Court, however, was concerned primarily with the district court's failure to even "identify which grantees it was referring to" when it claimed that pervasively sectarian institutions had received aid. Bowen, 487 U.S. at 620, 108 S.Ct. 2562. Moreover, while the Court noted that the district court had considered only two factors in making its pervasively sectarian determination, id. at 620 n. 16, 108 S.Ct. 2562, that clearly is not the case here.
 
 B.
 
 101
 Let there be no mistake about the probable impact of the majority's decision. By requiring the parties to develop an even more exhaustive record through what is in effect a trial, the majority undermines the secular educational purpose of Maryland's Sellinger Program. Inevitably government efforts to assist private education are complicated by the need for officials to determine carefully the proper constitutional boundaries governing such assistance. This court's remand now increases the difficulty of that task exponentially. The majority sends the clear message that these Establishment Clause questions can only be satisfactorily resolved upon a voluminous record that requires a court to scrutinize a religious institution's sectarian character with laser-like precision. This decision, therefore, will substantially increase the administrative costs associated with educational programs like Maryland's. Of course, the likely consequence of requiring states to undertake such costly and involved inquiries in connection with each and every funding decision is that such programs might well be abandoned altogether. No good deed, I suppose, goes unpunished: that Maryland's admirable attempt to support private higher education should become ensnared in the endless transaction costs of litigation is cause for dismay.
 
 
 102
 A remand is as unsatisfactory for the college as it is for the state. Requiring a lengthy trial on Columbia Union's sectarian character denigrates the very values underlying our Constitution's religion clauses. The First Amendment demands that the state "neither advance[ ] nor inhibit[ ] religion." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Specifically, the religion clauses ask, in part, whether institutions have "any incentive to modify their religious beliefs or practices in order to obtain ... services." Agostini, 117 S.Ct. at 2014. The Court, when addressing this question, traditionally has analyzed an agency program. See, e.g., id. Nevertheless, judicially-created tests present similar dangers because, in order to protect their funding decisions from court scrutiny, agencies must apply court standards. Indeed, in reaching its determination that Columbia Union was a pervasively sectarian institution, MHEC considered evidence on each and every factor previously outlined by the Supreme Court in Roemer. A remand in this case, and the bureaucratic inquiries it will spawn in later cases, bode poorly for all religious institutions. The scrutiny the majority now demands will encourage them to disown their own religious character in order to gain funding. The result is an Establishment Clause jurisprudence that, far from maintaining government neutrality toward religion, is a ballista, affirmatively attacking an institution's religious foundation.
 
 
 103
 Thus, while the majority attempts to speak solely in terms of judicial involvement with religious institutions, see ante at 169 n. 8, its decision plainly foreshadows further bureaucratic entanglement as well. The majority's factfinding adventure cannot help but result in intensive government involvement in religion. The Court recognized in Lemon that "state inspection and evaluation of the religious content of a religious organization" poses the special danger that "pervasive modern governmental power will ultimately intrude on religion and thus conflict with the Religion Clauses." 403 U.S. at 620, 91 S.Ct. 2105. The unnecessary level to which the majority requires the district court, and by extension government agencies like MHEC, to inquire into Columbia Union's sectarian character contains just such a threat. The more our nation's federal courts and government agencies become enmeshed in questioning religious character, the more they will control that character.
 
 
 104
 I recognize that higher education does or at least should act in an environment of public accountability. Institutions that utilize public funds incur obligations to explain how they use those funds. Accreditation by its very nature requires some level of scrutiny into a college's academic offerings. Nonetheless, I am astounded that the majority desires further evidence on "how [Columbia Union's] traditional liberal arts or mandatory religion courses are taught." Ante at 165. It is unfortunate that the majority would require Columbia Union to present the minutiae of its classroom modus operandi. Will there now be state agents sitting in class, not for academic evaluation, but to police the degree to which religious values inform classroom instruction? This intrusion not only eclipses that which is present in the accreditation process; it is an intrusion to which religious organizations are to be uniquely and discriminatorily subject.
 
 
 105
 An equal danger looms with the majority's direction to the factfinder, and therefore funding agencies, to inquire whether "religious principles are important to the college" and whether "religious indoctrination is more than a secondary objective." Ante at 164 (internal quotation marks omitted). Notwithstanding the majority's hope, see ante at 169 n. 8, matters such as these are not amenable to stipulation. Thus, an agency will be left to determine when indoctrination becomes a primary objective. What does this mean? If college students "believe," will the state deny funding? The fact of the matter is that agencies are in no position to serve as Orwellian probes, measuring how seriously someone takes his or her religious convictions.
 
 
 106
 Additionally, the razor-thin line the majority cuts between pervasively sectarian and pervasively nonsectarian institutions belies credibility. For instance, the majority suggests that because "only about 350 to 400 of Columbia Union's 1172 students" actually participate in its mandatory religious services, Columbia Union might not be pervasively sectarian. Ante at 164. Does this mean that the college is prohibited from requiring 500 students to attend services? Would it be certain to receive funding if it limited the number to 200? Or, consider the majority's focus on the college's bulletin. Ante at 165. It intimates that the business department's use of "only two" religious references might somehow be dispositive. Ante at 165. Would one particularly emphatic reference, therefore, always pass constitutional muster? What about three? Constitutionality should not be made to hinge on such inconsequential distinctions.
 
 
 107
 Similarly, the majority's remand effectively dumps at the state's doorstep the volatile tasks of distinguishing between religious institutions and drawing controversial and delicate lines. Religious institutions will be without clear guidance as to when they might become too sectarian. The three Catholic colleges currently receiving funding--Mount Saint Mary's College & Seminary, the College of Notre Dame of Maryland, and Loyola College--must now worry about whether they will at some indefinable point offend the state by stepping over the sectarian edge. For example, Mount Saint Mary's appoints the Archbishop of Baltimore as an automatic trustee and requires that at least one-fourth of its trustees, including the Archbishop, be ordained priests. Notre Dame requires that just under one-third of its trustees be nuns. And Loyola's president must be a member of the Society of Jesus. May Mount Saint Mary's raise its requirement to one-half? May Notre Dame increase its to more than one-third? May Loyola include the same prerequisite in its search for a vice president? How are these colleges to know? It will be impossible for them to predict at what point sectarian influences of this type will tip the scales. For religious institutions seeking Sellinger Program funds, the majority's remand simply raises more questions than it answers.
 
 
 108
 The "pervasively sectarian" test of Hunt, Roemer, and Bowen already places the judiciary in the uncomfortable role of determining just how religious an institution is, and requires that it draw somewhat arbitrary lines. But as long as directly controlling precedent requires such an inquiry, I would carefully shape the standards by which we measure an institution's sectarian nature such that the judiciary does not delve even deeper than necessary into religious inquiries we are likely most unqualified to answer. Cf. Widmar v. Vincent, 454 U.S. 263, 271 n. 9, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (terming the distinction between religious speech and religious worship "judicially unmanageable"). By requiring the district court to conduct a trial here, the majority has plunged government at all levels into the intimacies of religious faith. With respect, I would not choose that course.
 
 III.
 
 109
 In a final plea to the Maryland Higher Education Commission for funding under the Sellinger Program, the president of Columbia Union College asked, "If we recant, would we qualify?" Those words capture what this case is about. Despite the fact that it has met all neutral criteria for state aid, and despite the fact that other religious institutions are receiving funding, Columbia Union has yet to receive so much as a penny in state assistance. The only way it could receive such aid is by compromising or abandoning its religious views. That to me is impermissible inhibition of religion, impermissible discrimination under our Constitution's religion clauses, and a violation of the First Amendment right to express religious beliefs. "That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary." Everson v. Board of Educ., 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The Supreme Court in its recent enunciation of the neutrality principle has affirmed as much. But because the Court has not expressly overruled the funding prohibition principle in its First Amendment jurisprudence, I would affirm the judgment of the district court in this case.
 
 
 
 [1]
 As noted above, Columbia Union also alleges that this denial violated its free exercise and equal protection rights. A court considers these claims as one constitutional inquiry. See, e.g., Rosenberger, 515 U.S. at 827, 115 S.Ct. 2510; Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 389, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); Widmar v. Vincent, 454 U.S. 263, 266, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)
 
 
 [2]
 If the award of state funds to pervasively sectarian institutions violates the Establishment Clause, denial of Sellinger funds to Columbia Union is narrowly tailored to meet this interest. Columbia Union contends that a more narrowly tailored solution would be to order Maryland to amend its Sellinger grant program so that, rather than fund colleges directly, the State would provide such funds to students to be used at any qualifying college. Even assuming a federal court has the power to order the sovereign state of Maryland to amend a duly enacted state statute, we are at a loss for how this remedy is more narrowly tailored than simply denying funds to the one affected institution and permitting the statute, which otherwise operates within the bounds of the Constitution, to stand. Action taken to remedy an "evil" will be considered "narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (internal quotation marks omitted). Here, the asserted evil is violation of the Establishment Clause, which can be cured by simply denying funds to Columbia Union. Denying funding to all private colleges and instituting a new funding scheme would have far broader, rather than narrower, consequences
 
 
 [3]
 Were a college found to be "religiously affiliated" as opposed to "pervasively sectarian," however, the Roemer Court held that it could be funded under the Sellinger Program without resulting in any excessive "entanglement" in religious affairs. Roemer, 426 U.S. at 764-65, 96 S.Ct. 2337. Moreover, Roemer also makes clear that states, in making funding decisions, and courts in reviewing them, are competent to decide whether a college is "pervasively sectarian" without resulting in any "excessive entanglement." See id.; cf. Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 20, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) ("[there exists an] overriding interest in keeping the government--whether it be the legislature or the courts--out of the business of evaluating the relative merits of differing religious claims"). Neither party disputes that the same holds true in this case
 
 
 [4]
 The Supreme Court has held primary and secondary schools to be "pervasively sectarian." See, e.g., Meek v. Pittenger, 421 U.S. 349, 356, 364-67, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); Ball, 473 U.S. at 373, 105 S.Ct. 3248. However, the Court has often noted that children at this "impressionable age" are more prone to religious indoctrination than students attending colleges or universities. See Lemon, 403 U.S. at 616, 91 S.Ct. 2105; see also Tilton, 403 U.S. at 686, 91 S.Ct. 2091 ("college students are less impressionable and less susceptible to religious indoctrination"). Accordingly, while the factors demonstrating that a primary or secondary school is "pervasively sectarian" may be instructive here, they are not dispositive
 
 
 [5]
 This same point holds true for all of the other departments to which the district court refers. See Columbia Union, 988 F.Supp. at 903
 
 
 [6]
 The district court recognized that this factor could "not be viewed in isolation" but concluded that "the colleges at issue in Hunt and Tilton were far less sectarian" than Columbia Union, and so in Columbia Union's case its lack of institutional autonomy "lends support to the overall conclusion" that it "is pervasively sectarian." Columbia Union, 988 F.Supp. at 902. But the district court's determination that the Hunt and Tilton colleges are otherwise far less sectarian than Columbia Union rests on the inferences discussed above that we have held improper. See id. at 902 n. 8
 
 
 [7]
 The Court analogized the statute at issue in Bowen to the grant provisions at issue in Roemer. Bowen, 487 U.S. at 608, 108 S.Ct. 2562
 
 
 [8]
 Our dissenting colleague agrees with the holdings reached in the first three portions of this opinion, but disagrees with our ultimate conclusion that this case must be remanded. We, too, regret the burdens imposed by a remand but believe that the importance of the constitutional interests asserted here and the complexity of the required legal inquiry mandate nothing less. On remand, the parties may well be able to ease these burdens by stipulating to many of the unresolved factual issues. But notwithstanding the parade of horribles and rhetorical questions in the dissent, Supreme Court precedent requires examination of not only a college's written policies, but also of how a college implements those policies; a just determination of the latter question is simply impossible on this record. Moreover, the Supreme Court has specifically held (and neither Columbia Union nor the State disputes) that when a court conducts this sort of examination it does not engage in any "excessive entanglement" with religion. See Roemer, 426 U.S. at 764-65, 96 S.Ct. 2337. By ignoring Roemer 's dictates and instead suggesting that Roemer requires affirmance on the basis of the inadequate record here, the dissent attempts to undermine the very precedent it concedes we must follow
 
 
 [1]
 The Court's recent decision in National Endowment for the Arts v. Finley, --- U.S. ----, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), is not to the contrary. The Court distinguished that case from Rosenberger on the ground that NEA grants are not generally available but rather are awarded through a "competitive process." Finley, 118 S.Ct. at 2178. Like the subsidy considered in Rosenberger, however, Maryland's educational grants are made available generally through a noncompetitive process. Accordingly, this case is governed by the First Amendment analysis set forth in Rosenberger
 
 
 [2]
 The majority argues that a court "must consider not only the institution's written literature, policies, and statements, but also its practices " in divining an answer to the pervasively sectarian question. Ante at 169 (emphasis added) (citing Roemer, 426 U.S. at 756, 96 S.Ct. 2337). Nothing in the Court's jurisprudence substantiates this claim. The majority points to Bowen, Roemer, and Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), for support. While each of these opinions utilizes evidence of practice, none requires it. Moreover, in Tilton, the Court explicitly relied, as the district court did in this case, on the parties' stipulations in making its determination. 403 U.S. at 686-87, 91 S.Ct. 2091